**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**VIRGINIA HARDWAY,**

      **Plaintiff,**

**v.**                                      **Case No.: 2:14-cv-07339**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") terminating Claimant's supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 13 & 16).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the

presiding District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 13); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.    Procedural History

Plaintiff Virginia Hardway ("Claimant") filed an application for SSI on August 19, 2002, alleging a disability onset date of February 1, 1997. (Tr. at 220). In a June 2003 determination, the Social Security Administration ("SSA") found that Claimant was disabled as of August 1, 2002. (Tr. at 40, 114, 117). On October 28, 2011, the SSA sent a Notice of Disability Cessation letter to Claimant informing her that upon review, a determination was made that Claimant's health had improved and she was now considered able to work. (Tr. at 133). Claimant subsequently requested that the SSA reconsider its decision. (Tr. at 136-37). The SSA denied Claimant's request initially and upon reconsideration after a hearing before the Disability Hearing Unit. (Tr.at 115, 116, 172). Claimant then filed a request for an administrative hearing, (Tr. at 175), which was held on September 28, 2012 before the Honorable James P. Toschi, Administrative Law Judge ("ALJ"). (Tr. at 56-113). By written decision dated October 16, 2012, the ALJ found that Claimant's disability had ended on October 28, 2011, and that she had not become disabled again since that date. (Tr. at 40-53). The ALJ's decision became the final decision of the Commissioner on December 16, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 3). The

Commissioner subsequently filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10 & 11). Claimant then filed a Brief in Support of the Complaint, (ECF No. 12), and a Replacement Brief in Support of the Complaint, (ECF No. 13). In response, Defendant filed a Brief in Support of Defendant's Decision. (ECF No. 16). Therefore, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 47 years old at the time that she requested reconsideration of the SSA's cessation decision and 48 years old on the date of the ALJ's decision. (Tr. at 37, 116, 136). Claimant communicates in English. (Tr. at 231). She completed the eighth grade and has obtained a GED. (Tr. at 60, 238, 267, 305). Claimant previously worked in a school cafeteria stocking shelves and as a janitor. (Tr. at 59-60). Claimant only worked these positions a few days each month as part of a welfare-to-work program. (Tr. at 59, 336; ECF No. 13 at 9 n.2).

## III.   Summary of ALJ's Decision

An individual is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Under federal law, recipients of SSI benefits are subject to periodic continuing disability reviews. 20 C.F.R. §§ 416.989, 416.990. Thus, an SSI recipient's benefits may be terminated if "medical or other evidence shows" that he is no longer disabled as defined by the Social Security Act. *Id.* § 416.990(a).

There is no presumption of continuing disability. 20 C.F.R. § 416.994(b)(1)(vi) ("Our decisions under this section will be made on a neutral basis without any initial

inference as to the presence or absence of disability being drawn from the fact that you have previously been determined to be disabled."). Instead, the Social Security regulations establish a seven-step sequential evaluation process for reviewing SSI awards during a continuing disability review. *Id.* § 416.994(b)(5). If an individual is found "unable to engage in substantial gainful activity" at any step of the process, further review will cease, and the claimant's benefits will be continued. *Id.* First, the ALJ determines whether the claimant has an impairment or combination of impairments that meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). 20 C.F.R. § 416.994(b)(5)(i). If the impairment or combination of impairments does meet or equal a listed impairment, then the claimant is found disabled and benefits are continued. *Id.*

Second, if the impairment does not meet or equal a listed impairment, the ALJ must determine whether there has been medical improvement. *Id.* § 416.994(b)(5)(ii). Medical improvement is defined as "any decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." *Id.* § 416.994(b)(1)(i). To determine whether medical improvement has occurred, the ALJ must "compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled to the medical severity of that impairment(s) at that time." *Id.* § 416.994(b)(1)(vii). Any decrease in medical severity "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with" a claimant's impairments. *Id.* § 416.994(b)(1)(i). Thus, "[i]f there has been no decrease in medical severity, there has been no medical improvement." *Id.* §

4

416.994(b)(5)(ii). Third, if there has been medical improvement, then the ALJ ascertains whether the medical improvement is related to the claimant's ability to do work; that is, whether there has been an increase in the claimant's Residual Functional Capacity ("RFC") based upon impairments that were present at the time of his or her most recent favorable medical determination. *Id.* § 416.994(b)(5)(iii). If no medical improvement is found at step two, or if medical improvement is found to be unrelated to the claimant's ability to work at step three, then at step four, the ALJ will consider whether an exception demonstrating the claimant's ability to engage in substantial gainful activity applies. *Id.* § 416.994(b)(5)(iv).[1]

If the claimant's medical improvement is related to his or her ability to do work under step three, then in the fifth step, the ALJ will determine whether all of the claimant's current impairments in combination are considered to be severe. *Id.* § 416.994(b)(5)(v). If the claimant's impairments in combination do not significantly limit his or her physical or mental abilities to do basic work activities, then the impairments are considered non-severe, and the claimant is no longer considered disabled. *Id.* However, if the claimant's impairments in combination are severe, then under the sixth inquiry, the ALJ will assess the claimant's RFC to determine whether the claimant can

---

[1] There are two groups of applicable exceptions. The first group of exceptions includes circumstances under which (1) the claimant is "the beneficiary of advances in medical or vocational therapy or technology" related to his or her ability to work; (2) the claimant has undergone vocational therapy related to his or her ability to work; (3) new or improved diagnostic or evaluative techniques demonstrate that the claimant's impairments are not as disabling as they were considered to be at the time of the most recent favorable decision; or (4) the prior favorable disability decision was in error. 20 C.F.R. § 416.994(b)(3). If an exception from the first group applies, then the analysis proceeds to the fifth step. *Id.* § 416.994(b)(5)(iv). The second group of exceptions includes circumstances under which (1) a prior determination or decision was fraudulently obtained; (2) the claimant does not cooperate with the Social Security evaluators; (3) the claimant cannot be found; or (4) the claimant fails to follow prescribed treatment that would be expected to restore his or her ability to engage in substantial gainful employment. *Id.* § 416.994(b)(4). If an exception from the second group applies, then the claimant's disability will be found to have ended. *Id.* § 416.994(b)(5)(iv). If none of the exceptions from either group apply, then the claimant's disability will continue. *Id.*

still perform work that he or she has done in the past. *Id.* § 416.994(b)(5)(vi). If the claimant can do such work, then the claimant's disability will be found to have ended. *Id.* On the other hand, if the claimant cannot perform past relevant work, or if there is insufficient evidence in the file to make this determination, then under step seven, the ALJ will consider whether the claimant is able to perform other work, while taking into account the claimant's RFC, age, education, and prior work experience. *Id.* § 416.994(b)(5)(vii)-(viii). If the claimant is capable of performing other work, then the claimant's disability has ended; however, if the claimant is incapable of engaging in other work, then the claimant's disability continues. *Id.* § 416.994(b)(5)(vii). In this final step, in order to establish that a claimant is capable of performing other work, the Commissioner bears the burden of demonstrating that the work "exists in significant numbers in the national economy." *See Guiton v. Colvin*, 546 F. App'x 137, 141 (4th Cir. 2013).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social

functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ made a number of preliminary findings. First, he found that the most recent favorable decision for Claimant was the determination dated June 2, 2003, which, consequently, became the comparison point decision ("CPD"). (Tr. 41, Finding No. 1). The ALJ noted that, at the time of the CPD, Claimant had the following medically determinable impairments: "major depression and bipolar disorder." (Tr. at 41, Finding No. 2). The ALJ recognized that these impairments were found to result in an RFC that moderately limited Claimant's ability to complete a normal workday or workweek without interruptions from psychologically based symptoms. (Tr. 41-42,

Finding No. 2). In addition, the ALJ found that Claimant had not engaged in substantial gainful activity since October 28, 2011, which was the date that Claimant's disability ended. (Tr. 42, Finding No. 3). As a final preliminary matter, the ALJ determined that as of October 28, 2011, and at the time of the ALJ's decision, Claimant had the following medically determined impairments: "osteoporosis; bipolar disorder, not otherwise specified; and anxiety disorder, not otherwise specified." (Tr. at 42 Finding No. 4).

At the first step of the sequential evaluation process, the ALJ concluded that since October 28, 2011, Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 42-43, Finding No. 5). At the second step, the ALJ found that medical improvement had occurred as of October 28, 2011. (Tr. at 43, Finding No. 6). The ALJ next determined that Claimant's osteoporosis, bipolar disorder, and anxiety disorder had been severe impairments since October 28, 2011. (Tr. at 44-45, Finding No. 7). The ALJ also considered Claimant's other alleged or medically determinable impairments, including shortness of breath, low weight, gastroesophageal reflux disease, overactive bladder, hypertension, and hyperlipidemia. (Tr. at 44-45). However, the ALJ found these alleged impairments to be non-severe. (*Id.*) Moreover, the ALJ explicitly addressed Claimant's "signs and symptoms" of deficits in intellectual functioning, ultimately concluding that Claimant had "no medically determinable impairment" related to her intellectual functioning. He explained that the record did not establish "any intellectual limitations;" particularly, as Claimant "is an individual who has obtained her GED." (Tr. at 45).

The ALJ subsequently found that beginning on October 28, 2011, Claimant possessed:

[T]he residual functional capacity to perform light work as defined in 20

8

CFR 416.967(b) except she should avoid ladders, ropes, scaffolds. She should avoid concentrated exposure to pulmonary irritants, and all exposure to hazards such as heights and machinery. She would be limited to detailed instructions and tasks with no fast-paced work or strict production quotas.

(Tr. at 46-51, Finding No. 8). Next, the ALJ ascertained that Claimant had no past relevant work. (Tr. 51, Finding, No. 9). Under the seventh and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in other work. (Tr. at 51-52, Finding Nos. 10-13). The ALJ considered that (1) Claimant was born in 1963, and was defined as a younger individual; (2) she had at least a high school education/GED and could communicate in English; and (3) transferability of job skills was not an issue because Claimant did not have past relevant work. (Tr. at 51, Finding Nos. 10-12). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that beginning on October 28, 2011, Claimant could perform jobs that exist in significant numbers in the national economy, including work in light, unskilled occupations such as laundry worker, mailroom clerk, and kitchen worker. (Tr. at 51-52, Finding No. 13). Therefore, the ALJ concluded that Claimant's disability ended on October 28, 2011, and she had not become disabled again since that date. (Tr. at 52, Finding No. 14).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. Claimant's first challenge relates to the ALJ's treatment of her IQ scores. She insists that the ALJ erred in concluding that she has no medically determinable intellectual impairment. (ECF No. 13 at 5). Given her IQ test scores and the evidence of her deficits in adaptive functioning beginning in childhood, Claimant argues that the ALJ should have considered Listing 12.05B, which he did not. (*Id.*) Claimant contends that the ALJ failed to consider that

two clinical psychologists diagnosed her with mental retardation, and that the ALJ placed an inordinate amount of emphasis on Claimant obtaining a GED. (*Id.* at 7, 13). Relatedly, Claimant contends that the ALJ failed to adequately explore the circumstances surrounding Claimant's earning of a GED and that he improperly interfered with her counsel's ability to question her and the medical expert at the administrative hearing on the topics of Claimant's GED and adaptive functioning. (*Id.* at 13-18). In addition, she argues that the ALJ incorrectly found that discrepancies existed with regard to Claimant's history of special education. (*Id.* at 7). Moreover, Claimant points out that the ALJ failed to discuss the results of an IQ test administered by Larry J. Legg, M.A., in June 2012. (*Id.* at 11). In her second challenge to the Commissioner's decision, Claimant asserts that the Appeals Council improperly rejected new and material evidence supporting the validity of Claimant's IQ test scores and her claims of a lack of adaptive functioning. (*Id.* at 18-19). She insists that the Appeals Council should have reversed the ALJ's decision and remanded her claim based on new evidence. (*Id.*)

In response, the Commissioner contends that the ALJ properly discounted Claimant's IQ scores given her "objective mental status findings," past work history, social relationships, activities of daily living, and possession of a GED. (ECF No. 16 at 11). The Commissioner points out that a medical expert, Dr. Blair, testified at the administrative hearing that all of the IQ test scores relied on by Claimant are invalid. (*Id.* at 13, 17). Dr. Blair also testified that a person with such a low IQ score would not be able to function outside of an extremely structured environment. (*Id.* at 17). With regard to Claimant's GED, the Commissioner points out that Dr. Blair opined that a person must have an IQ score of at least 80 to pass the GED test. (*Id.*) The Commissioner also maintains that the first time Claimant presented any allegation that she suffered from

an intellectual disability was after she was found to be no longer disabled due to her depression. (*Id.* at 4, 16). The Commissioner asserts that none of Claimant's treating physicians ever diagnosed her with a mental deficit. (*Id.* at 6). Moreover, the Commissioner argues that Claimant failed to demonstrate deficits in adaptive functioning prior to age 22 as she currently can perform a number of adaptive activities, including household chores, watching television, cooking, doing laundry, using public transportation, shopping, managing her own money, and attending to her personal care without assistance. (*Id.* at 14). Finally, the Commissioner maintains that the Appeals Council correctly determined that the evidence submitted after the ALJ's decision was not relevant to the time period of her claim. (*Id.* at 19). The Commissioner asserts that some of this evidence was dated after the ALJ's decision, which was not relevant to the current claim. (*Id.*) In addition, with regard to records that existed before the ALJ's decision, the Commissioner insists that Claimant has failed to explain how those records are relevant and why they were not submitted at an earlier time. (*Id.*)

## V.   <u>Relevant Medical History</u>

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following summary relates to those records that are relevant to the issues raised by the parties.

### *A. Evaluations and Opinions Related to Claimant's IQ*

### 1. Nancy Price, M.A., and Kay Collins-Ballina, M.A.

On October 23, 2002, when Claimant was just shy of 39 years old, she underwent a consultative evaluation by Nancy Price, M.A., supervised psychologist, and Kay Collins-Ballina, M.A., Licensed Psychologist, of Associates in Counseling & Psychology. (Tr. at 335-39). Claimant indicated that she was applying for SSI benefits because she

"couldn't function on a daily basis" and had "bad nerves." (Tr. at 335). Claimant complained of frequent crying episodes, poor concentration, chronic headaches, mood swings, sleep problems, and agitation. (*Id.*) The examiners were not provided with records to review other than Claimant's application form. (*Id.*) Claimant informed the psychologists of her past mental health treatment, which included treatment for a drug overdose in 1974, as well as a prior psychiatric inpatient hospitalization for six weeks. (Tr. at 335-36). Claimant reported that she began treatment with Ted Thornton, M.D., for mental health issues in 2002 due to depression and received prescriptions for Paxil, Wellbutrin, Trileptal, Neurontin, and Vistaril; however, Claimant reported she stopped taking the medication as it made her sick. (Tr. at 336). Claimant relayed that she had an instance of suicidal ideation in 2002, which resulted in a referral to Charleston Area Medical Center for treatment. (*Id.*) Claimant was not hospitalized on this occasion, but was prescribed Ativan and advised to follow up with Dr. Thornton. (*Id.*) Claimant indicated that she had developmental delays during early childhood, although she had no memory of ever having received any type of therapy, such as speech therapy or physical therapy. (*Id.*) Claimant indicated that she completed the eighth grade, but quit school in the ninth grade. (*Id.*) She further reported that she had received special education services for reading and English classes. (*Id.*) Claimant later obtained a GED in 1992 from the Calhoun County Career Center. (*Id.*) Claimant provided an employment history that included work as a janitor and cook, which she performed as part of a welfare-to-work program. (*Id.*) At the time of the evaluation, Claimant was unemployed and did not have a driver's license. (*Id.*)

Upon mental status examination, Claimant was cooperative, but withdrawn, and it took some time for the psychologists to establish a rapport with her. (*Id.*) Claimant

responded slowly to questions, had poor eye contact, did not initiate conversation, and did not display a sense of humor. (Tr. at 336-37). The examiners determined that Claimant's social skills were moderately deficient. (Tr. at 337). They observed that Claimant's speech quality and quantity were poor with a low volume and delayed rate. (*Id.*) Claimant's mood appeared anxious with a flat affect. (*Id.*) Her stream of thought was disordered; however, there was no evidence of delusions, obsessions, compulsions, or phobias. (*Id.*) Claimant displayed fair insight, though her judgment was deemed markedly deficient based on her comprehension subtest scores. (*Id.*) The examiners observed that Claimant's immediate memory was moderately deficient based on her ability to recall two out of four words listed for her. (*Id.*) Claimant's recent memory was observed to be severely deficient, as she could not recall any of the four words after a thirty-minute delay, and her remote memory was found to be within normal limits. (*Id.*) The psychologists recorded that Claimant's concentration was markedly deficient due to her digit span subtest score. (*Id.*) Claimant's psychomotor behavior was observed to be within normal limits. (*Id.*)

At the examination, the psychologists administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III). (Tr. at 337). The examiners recorded that Claimant demonstrated a verbal IQ score of 55, a performance IQ of 55, and a full scale IQ of 51.[2] (*Id.*) Claimant was also given the Wide Range Achievement Test, Third Edition (WRAT-III). (*Id.*) The psychologists determined that Claimant's reading and arithmetic skills were that of a second-grade student, and her spelling skills were that of a kindergarten student. (*Id.*) They concluded that Claimant's IQ scores were invalid

---

[2] Where verbal, performance, and full scale IQ scores are provided, the SSA must consider the lowest score in analyzing Listing 12.05. *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003).

because, throughout testing, Claimant seemed withdrawn, put forth minimal effort, gave up easily, and had difficulty seeing the test because she did not have her prescription glasses. (*Id.*) In addition, the psychologists considered external factors in assessing the validity of the IQ scores, including that Claimant had obtained a GED and that she had worked two rotating positions during a ten-year period. (Tr. at 337-38). The psychologists also opined that Claimant's WRAT-III scores were inconsistent with her achieving a GED and holding two jobs for a ten-year period. (Tr. at 338). They further noted that Claimant gave poor effort, hesitated when providing answers, and did not bring her glasses with her, which supported a diagnosis of malingering. (*Id.*)

Claimant reported to her examiners that her daily activities consisted of watching television, completing household chores, smoking cigarettes, and socializing with her boyfriend whom she lived with at the time. (Tr. at 335, 338). She indicated that she cared for her personal hygiene, cooked meals, and did laundry, although her boyfriend was responsible for grocery shopping and managing their finances. (Tr. at 338). As to social functioning, Claimant reported she was not involved in community or familial groups as she did not like to be around other people. (*Id.*) The examiners concluded that Claimant's social functioning was moderately deficient based on their observations of her. (*Id.*) As to persistence, Claimant was found to have moderate deficiency based on the examiners' observations of her ability to stay on task during testing. (*Id.*) The psychologists further noted that Claimant's pace was moderately slow as witnessed during testing and during the interview. (Tr. at 339). Claimant was diagnosed with malingering and depressive disorder, not otherwise specified (by history). (Tr. at 338). The psychologists opined that Claimant's prognosis was fair. (*Id.*) They also found that Claimant was capable of managing her own finances. (Tr. at 339).

### 2. Michael C. Sheridan, M.A.

Michael Sheridan, M.A., licensed psychologist, performed an initial psychological evaluation of Claimant on December 15, 2011, at the request of her attorney for the purpose of determining her eligibility for disability benefits. (Tr. at 554-567). Claimant could not recall her early developmental history, although she was able to provide her place of birth and her childhood residential history. (Tr. at 555). She reported that there was a family history of mental illness and mental retardation. (*Id.*) As for her education, Claimant stated that she attended school through junior high and dropped out her first semester of high school because she believed she was not emotionally able to handle school and she "just couldn't do the school work." (Tr. at 556). She also reported having seizures around that time. (*Id.*) Claimant was enrolled in a special education program for reading and mathematics while in school, but she did not believe that the program helped her. (*Id.*) She indicated that she received her GED in 1991. (*Id.*) She informed Mr. Sheridan that she did not have a driver's license because she was too nervous to drive. (*Id.*) Claimant also told Mr. Sheridan that she had never held a job. (*Id.*) Claimant stated that her depression began at a young age; she had difficulty making friends, and she experienced thoughts of suicide. (*Id.*) Claimant mentioned a total of four psychiatric inpatient hospitalizations, beginning at age twelve or thirteen in addition to three hospitalizations within the previous ten years. (*Id.*) Her most recent hospitalization occurred five years prior to the evaluation, when she began experiencing hallucinations and attempted to commit suicide. (*Id.*) Claimant denied having suicidal thoughts since that time, but she did report experiencing the occasional paranoid thought. (*Id.*)

Mr. Sheridan reviewed a January 6, 2011 psychiatric evaluation by Claimant's treating physician, Lois Urick, M.D., who diagnosed Claimant with bipolar disorder,

NOS, and anxiety, NOS. (Tr. at 556-57). Mr. Sheridan also noted that Claimant began seeing a counselor in December 2011 for stress related to the possibility of losing her SSI benefits. (Tr. at 557). Claimant's medications at that time included Lamotrigine, Geodon, Toviaz, Simvastatin, Nexium, Cyclobenzaprine, Hydrocodone, Alendronate, and Metoprolol Succinate. (*Id.*)

Claimant informed Mr. Sheridan that she relied heavily on her mother-in-law to help her with her medications, shopping, and paying bills. (*Id.*) Mr. Sheridan recorded that Claimant's mother-in-law accompanied Claimant to the examination and assisted with the office paperwork and provided information as to Claimant's history and current status. (Tr. at 557-58). Claimant described her mood that day as average, stating that she had good days and bad days, with more of the latter than the former. (Tr. at 558). On good days, her activities might include calling her sister or a friend, or watching television, but on a bad day, she stayed in her house and avoided other people. (*Id.*) She further reported having feelings of sadness, crying spells, decreased sleep, and insomnia. (*Id.*) Claimant stated that on an average day, she woke up, made coffee, ate breakfast, went back to bed until noon, took medication, periodically called her sister, watched television, fixed sandwiches as meals, and sometimes had visitors. (Tr. at 558-59). She only left her home to go grocery shopping twice each month. She did not belong to any clubs or organizations. (Tr. at 559).

Mr. Sheridan recorded that Claimant was oriented to person, place, time, and situation. (Tr. at 558). He also noted that Claimant could name the current president, but not the immediate past president. (*Id.*) She could recall three words immediately, and one of three words after a ten-minute delay. (*Id.*) She was also able to discuss recent events in her life. (*Id.*) Mr. Sheridan noted that Claimant was unable to perform a "serial

sevens" test, but could say the days of the week backwards. (*Id.*)

At the examination, Mr. Sheridan administered a series of psychological tests. First, Mr. Sheridan had Claimant complete the Bender-Gestalt II test. (Tr. at 559). He observed that Claimant's standard score of 72 was approximately two standard deviations below the mean. (*Id.*) Mr. Sheridan noted reversals on five of the eleven figures, which he opined was highly suggestive of a possible organic brain syndrome. (*Id.*) On the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), Claimant scored 61 on verbal comprehension, 63 on perceptual reasoning, 55 on working memory, and 50 on processing speed. (Tr. at 559, 563.) Claimant earned a full scale IQ score of 51, which placed her within the 0.1 percentile. (Tr. at 559). Mr. Sheridan recorded that Claimant's subtest scaled scores were similarly consistent and fell within the extremely low range across the battery of tests. (*Id.*) Mr. Sheridan indicated that testing conditions were ideal and Claimant appeared to give a valid effort on all tasks presented, which meant that there was no reason to believe that the test results were invalid. (*Id.*) He further observed that Claimant's depressive symptoms likely lowered her WAIS-IV scores to some degree, but that her academic and job history as well as her long-term interpersonal functioning evidenced significantly subaverage general intellectual functioning and deficits in adaptive behaviors, which both extended back in time to Claimant's developmental period. (Tr. at 561). Therefore, he opined that Claimant met the diagnostic criteria for mental retardation. (*Id.*)

Mr. Sheridan also administered the Woodcock-Johnson III Normative Update Tests of Achievement. (Tr. at 560). Claimant scored at the 1.8 grade level in letter-word identification and 1.2 grade level in passage comprehension. (*Id.*) Mr. Sheridan noted that these scores were consistent with Claimant's general level of intellectual

functioning. (*Id.*) The final test that Mr. Sheridan administered was the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2). Mr. Sheridan recorded that Claimant's results on the MMPI-2 were consistent with symptoms of severe, chronic depression and irrational patterns of thought. (*Id.*) He also noted that individuals with similar test profiles are generally diagnosed with moderate to severe depression with suicidal ideation, anxiety, phobias, anhedonia, obsessional worry and rumination, compulsions, self-deprecation, psychomotor retardation, and agitation. (*Id.*) According to Mr. Sheridan, individuals with similar test profiles also possess severe impairment in concentration and decision-making, but judgment, reasoning, and problem-solving skills may be preserved. (*Id.*) Mr. Sheridan observed that Claimant's F-scale scores were significantly elevated, which tends to evidence symptom exaggeration or severe psychopathology. (*Id.*) Given Claimant's $F_p$ scale score, Mr. Sheridan concluded that the latter was far more likely. (*Id.*)

Mr. Sheridan diagnosed Claimant with bipolar disorder, not otherwise specified, by history (provisional); rule out schizoaffective disorder; and mild mental retardation. (Tr. at 561). He assigned a Global Assessment of Functioning (GAF) score of 30.[3] (*Id.*) Mr. Sheridan further opined that Claimant would have difficulty managing disability benefits given her academic history and achievement levels, and he suggested the appointment of a representative for Claimant if benefits were awarded. (Tr. at 561-62).

---

[3] The Global Assessment of Functioning ("GAF") Scale is a 100–point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. text rev.2000) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. A GAF score between 21 and 30 means that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *Id.* at 34.

On May 25, 2012, Mr. Sheridan completed a Psychiatric Review Technique. (Tr. at 615-28). He opined that Claimant equaled Listing 12.02 and met the Listings for 12.03, 12.04, and 12.05. (Tr. at 615). In relation to Listing 12.05, Mr. Sheridan found that Claimant met Listing 12.05A and 12.05B. (Tr. at 619). As to pertinent signs or symptoms supporting this conclusion, Mr. Sheridan listed "mental retardation [versus] dementia." (*Id.*) With regard to Claimant's functional limitations, Mr. Sheridan determined that she had marked limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 625). Mr. Sheridan indicated that Claimant had "at least" one or two episodes of decompensation of extended duration. (*Id.*) Additionally, Mr. Sheridan concluded that Claimant met the criteria of paragraph "C." (Tr. at 626). In making this determination, Mr. Sheridan found that Claimant suffered from repeated episodes of decompensation and a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Claimant to decompensate. (Tr. at 626). In support of his Psychiatric Review Technique, Mr. Sheridan cited his December 2011 psychological evaluation of Claimant. (Tr. at 627).

Mr. Sheridan also completed a Mental Residual Functional Capacity Assessment the same day. (Tr. at 629-31). He opined that Claimant had marked limitations in her ability to remember locations and work-like procedures, and her ability to understand and remember detailed instructions. (Tr. at 629). He also determined that Claimant was markedly limited in all categories of sustained concentration and persistence. (Tr. at 629-30). Mr. Sheridan further opined that Claimant had marked limitations in a number of categories of social interaction and adaptation. (Tr. at 630). In support of his

opinions, Mr. Sheridan again cited his December 2011 psychological evaluation of Claimant. (*Id.*)

### 3. Larry J. Legg, M.A.

On June 15, 2012, Larry J. Legg, M.A., Licensed Psychologist, performed an Adult Mental Profile evaluation for the West Virginia Disability Determination Service. (Tr. at 633-41). Mr. Legg observed that Claimant was clean and suitably dressed, cooperative, and serious. (Tr. at 634). Claimant reported dropping out of school in the ninth grade as she "couldn't do the work." (*Id.*) Claimant could not confirm whether she had ever been diagnosed with mental retardation, although she believed that she did have learning disabilities in several areas of academics while in school. (*Id.*) Claimant also felt that she had deficits in her social, work, and interpersonal skills as a teenager and young adult. (*Id.*) Claimant reported obtaining a GED in 1992. (*Id.*) Claimant again described experiencing depression, which she believed began during childhood. (Tr. at 634-35). She stated that she felt depressed that day and more often than not. (Tr. at 635). Claimant further reported weight loss, insomnia, and fatigue, along with problems concentrating and remembering things. (*Id.*) She relayed that she had been diagnosed with bipolar disorder and anxiety disorder in the past. (*Id.*)

Mr. Legg recorded that he reviewed a number of treatment records before the evaluation. (Tr. at 635-36). Specifically, he reviewed a comprehensive psychiatric evaluation completed in 2002 by Dr. Thornton, pharmacological management progress notes from Highland Behavioral Health, the consultative evaluation report completed by Ms. Price in 2002, and medical progress notes and psychiatric evaluations from Seneca Health Services. (*Id.*) In addition, Mr. Legg examined the psychological evaluation completed by Mr. Sheridan in 2011. (Tr. at 636).

Examining Claimant's educational history in more detail, Mr. Legg opined that obtaining a GED required reading, basic math, and problem solving skills at a minimum of a ninth-grade level. (Tr. at 637). Given the reports of Ms. Price and Mr. Sheridan, Mr. Legg opined it would have been "nearly impossible" for Claimant to have earned a GED. (*Id.*) Consequently, Mr. Legg stated that he could not "reconcile" the data given the limited information available for his review at the time of his evaluation of Claimant. (*Id.*)

Mr. Legg's psychometrician, Teri Woolwine, B.S., administered the WAIS-IV at the evaluation.[4] (Tr. at 633, 638). Claimant scored 51 on verbal comprehension, 58 on perceptual reasoning, 63 on working memory, and 53 on processing speed. (Tr. at 638). Claimant's full scale IQ score was 50. (*Id.*) Mr. Legg recorded that these scores were internally valid as the psychometrician reported that Claimant put forth her best effort, there was no evidence of intoxication, Claimant could see the test items, and she could hear the directions without difficulty. (*Id.*) Mr. Legg further opined that the scores were externally valid because the scores were consistent with those received when testing with Mr. Sheridan. (*Id.*) Mr. Legg also indicated that the scores were consistent with Claimant's history of special education placement. (*Id.*) However, Mr. Legg did state that it appeared "somewhat inconceivable" that Claimant could possess a GED given the test results. (Tr. at 638-39). Ultimately, Mr. Legg concluded that the scores were a valid measure of Claimant's level of intellectual functioning given all of the evidence available to Mr. Legg. (Tr. at 639). He noted that these scores placed Claimant in the extremely low range of general intellectual functioning. (*Id.*)

---

[4] A psychometrician is "a professional who administers and scores psychological and neuropsychological tests under the supervision of a licensed psychologist or neuropsychologist." *Richardson v. Branker*, 668 F.3d 128, 151 n.24 (4th Cir. 2012) (citation and markings omitted).

Mr. Legg's psychometrician also administered the WRAT-IV at the evaluation. (Tr. at 639). Claimant received grade scores of 1.6 in word reading, K.8 in spelling, and 3.8 in math computation. (*Id.*) Mr. Legg indicated that he and his psychometrician believed that the scores accurately represented Claimant's level of achievement given the psychometrician's observation that Claimant put forth sufficient effort during testing. (*Id.*)

Upon mental status examination, Claimant was observed to have a dysphoric mood, flat affect, normal thought process, normal thought content, and normal psychomotor behavior. (*Id.*) She also exhibited fair insight. (*Id.*) Mr. Legg observed that Claimant's judgment was moderately deficient. (*Id.*) He indicated that Claimant's immediate memory was within normal limits; however, her recent memory was moderately deficient and her remote memory was mildly deficient. (*Id.*) Claimant's concentration was determined to be severely deficient based on her digit span subtest scaled score of one. (*Id.*) Mr. Legg opined that Claimant's pace was mild-to-moderately deficient based on his observations of her. (*Id.*) Claimant's persistence was found to be within normal limits given her ability to stay on task during her mental status examination. (*Id.*) As for social functioning, Claimant was found to be mildly deficient based on clinical observation. (Tr. at 639-40). Claimant reported that she generally got along well with her husband, she had a few friends, she left her home twice each month to run errands or attend appointments, and she saw her siblings occasionally. (Tr. at 640). Mr. Legg noted that Claimant's daily activities included taking morning pain medication then returning to bed until mid-morning, preparing a lunch consisting of soup or a sandwich, watching television, and spending most of the day at home resting. (*Id.*) Claimant also indicated that her husband prepared dinner and washed the dishes;

on rare occasions, Claimant stated that she performed minimal types of household chores. (*Id.*)

Mr. Legg diagnosed Claimant with major depressive disorder, recurrent, severe without psychotic features; generalized anxiety disorder; and mild mental retardation (by history). (*Id.*) He based his diagnosis of mild mental retardation on Claimant's test results in combination with his interview of Claimant. (*Id.*) Mr. Legg opined that Claimant's prognosis was fair and that she was capable of managing her own finances. (*Id.*)

In relation to his evaluation, Mr. Legg also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental). (Tr. at 642-44). Mr. Legg opined that Claimant had no limitations on her ability to understand, remember, and carry out simple instructions. (Tr. at 642). He also indicated that Claimant had no limitation in her ability to make judgments on simple work-related decisions. (*Id.*) However, he did find that Claimant had mild difficulty in understanding, remembering, and carrying out complex instructions. (*Id.*) He also determined that Claimant had moderate difficulty in her ability to make judgments on complex work-related decisions. (*Id.*) In addition, Mr. Legg opined that Claimant had mild difficulty in interacting appropriately with the public, supervisors, and co-workers. (Tr. at 643). He also concluded that Claimant possessed moderate difficulty in responding appropriately to usual work situations and changes in a routine work setting. (*Id.*) In support of these opinions, Mr. Legg cited Claimant's chronic mood and anxiety disorders along with her low level of intellectual, academic, and adaptive functioning. (Tr. at 642-43).

### 4. Michael D. Morrello, M.S., and Tiffany Garrett, M.A.

On February 4, 2013, Claimant was referred by her counsel to Tiffany Garrett,

23

M.A., supervised psychologist, and Michael D. Morrello, M.S., licensed psychologist, for a psychological evaluation. (Tr. at 828-36). During the initial examination performed by Ms. Garrett, Claimant informed Ms. Garrett that her social security benefits were being taken away as she was deemed capable of employment. (Tr. at 828-29). Claimant indicated that she suffered from manic bipolar disorder, anxiety, nervousness, and difficulty dealing with public places and people. (Tr. at 829). She also reported feeling depressed with frequent bouts of crying as well as sleep and appetite disruptions. (*Id.*) She stated that she had never been employed due to her problem with anxiety. (*Id.*) Claimant relayed that she had received mental health treatment for bipolar disorder for several years and was hospitalized for a nervous breakdown "a few years" prior to the examination. (*Id.*) She also informed Ms. Garrett that she had experienced past instances of auditory and visual hallucinations. (*Id.*) Claimant further indicated that she experienced racing thoughts, which resulted in a poor ability to concentrate. (Tr. at 830). Claimant asserted that she needed help from friends in order to complete household chores, but when asked to describe her friends, she stated that she did not really have any; however, she then acknowledged she had a few close friends. (*Id.*)

Claimant stated that she attended high school, but did not complete the ninth grade. (*Id.*) She expressed difficulty understanding the school work, which caused her frustration. (*Id.*) Claimant informed Ms. Garrett that she received special education classes for reading and math while in school, and she described her grades as "passing." (*Id.*) She felt her relationships with teachers and classmates was positive; however, she had been suspended from school for skipping class and had to repeat second grade due to excessive absence from school. (*Id.*) Claimant indicated that she obtained a GED in 1991. (*Id.*)

Ms. Garrett noted that Claimant was unable to complete the required paperwork for the evaluation. (Tr. at 831). Claimant had expressed difficulty with knowing her address, but she was able to provide other information that was used to verify her address. (*Id.*) Ms. Garrett observed that Claimant made adequate eye contact, and rapport was established and maintained. (*Id.*) Ms. Garrett recorded that Claimant's immediate memory was slightly deficient and her short term memory was deficient. (*Id.*) Claimant was unable to successfully complete a serial three subtraction test for five steps even with hesitation and counting on her fingers. (*Id.*) She also could not spell "world" when prompted. (*Id.*) Ms. Garrett further observed that Claimant was unable to "interpret parables through concrete reasoning." (*Id.*)

At the evaluation, Claimant was administered the WAIS-IV. (Tr. at 831-32). Claimant received a score of 63 in both verbal comprehension and perceptual reasoning, 60 in working memory, and 68 in processing speed. (Tr. at 831). Claimant's full scale IQ score was 57, which placed her within the .2 percentile. (*Id.*) In interpreting the results, Ms. Garrett and Mr. Morrello opined that Claimant's cognitive functioning measured in the mild mental retardation range. (Tr. at 832). The psychologists recorded that if Claimant were tested 100 times, Claimant's "true score" would fall within the mild mental retardation range 95 of those times. (*Id.*) They observed that there were a significant amount of symbols reversed on the coding section of the test, which could indicate the possibility of a learning disability. (*Id.*) The examiners concluded that Claimant's intellectual capabilities were comparable to prior IQ scores that she had received on the same type of test in the past ten years. (*Id.*)

Claimant was also given the WRAT-IV test at the evaluation. (*Id.*) Claimant's grade scores were K.9 in word reading, K.8 in spelling, and 3.8 in math computation.

(*Id.*) The psychologists indicated that Claimant's scores on the word reading and spelling subtests revealed that she fell within the lower extreme range and at the kindergarten grade level. (*Id.*) Claimant's math computation score placed her within the low range and at the third grade level. (*Id.*) The psychologists noted that Claimant's low score on the word reading subtest prohibited her from being able to complete the sentence comprehension subtest. (*Id.*) They opined that Claimant's achievement scores were comparable to her intellectual abilities and similar to her scores on the same test in previous years. (*Id.*) In addition to the WRAT-IV, Claimant was given the Bender Visual Motor Gestalt Test, which revealed that Claimant made drawings with few errors. (Tr. at 834). These results were not suggestive of brain damage or organicity. (*Id.*) The psychologists ultimately diagnosed Claimant with mild mental retardation and mood disorder, not otherwise specified (possibly bipolar disorder). (*Id.*) Claimant was assigned a GAF score of 63.[5] (*Id.*) The psychologists opined that Claimant's ability to maintain and sustain meaningful employment appeared small given her levels of anxiety and depression combined with her apparent inability to change her behaviors given her low cognitive functioning. (Tr. at 635).

In relation to their evaluation, the examining psychologists completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities form and a Psychiatric Review Technique. (Tr. at 837-56). They opined that Claimant had marked limitations in understanding, remembering, and carrying out short, simple instructions. (Tr. at 838). They also recorded that Claimant had extreme limitations in understanding, remembering, and carrying out detailed instructions, but only moderate

---

[5] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

limitation in her ability to exercise judgment or make simple work-related decisions. (*Id.*) This opinion was based on the psychologists' evaluation of Claimant and Claimant's low level of cognitive functioning. (*Id.*) The psychologists further opined that Claimant had marked limitations in sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, and completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks. (*Id.*) Claimant was also found to have marked or extreme limitations in the areas of social functioning, adaptation in a work environment, functioning independently in a competitive work setting, and her ability to tolerate ordinary work stress. (Tr. at 839-41). Claimant's limitations in her ability to adapt were based on her low level of cognitive functioning. (Tr. at 840). In their Psychiatric Review Technique, Mr. Morrello and Ms. Garrett concluded that Claimant met Listing 12.05B, among other listings. (Tr. at 847). They opined that a diagnosis of mental retardation was supported by Claimant's intelligence test scores. (*Id.*)

### B. Other Evaluations and Opinions

On April 11, 2003, Dr. Thornton completed a Medical Source Statement noting that Claimant had a long history of mood disturbances and anxiety. (Tr. at 378). Dr. Thornton did not address Claimant's IQ scores in his evaluation. (Tr. at 378). He found that Claimant's immediate and recent memory were normal. (Tr. at 379). However, he indicated that Claimant's concentration and pace were mildly deficient, and her social functioning and task persistence were moderately deficient. (*Id.*) Dr. Thornton diagnosed Claimant with bipolar disorder and indicated that he had prescribed Lithium. (*Id.*) Dr. Thornton recorded that Claimant suffered from mood instability and

nervousness causing her to be unsuitable for employment at that time. (Tr. at 380).

James Binder, M.D., completed a Psychiatric Review Technique on May 16, 2003, concluding that an RFC Assessment would be necessary. (Tr. at 393-406). Dr. Binder observed that Claimant suffered from an affective disorder. (Tr. at 393). He noted that Claimant alleged she suffered from depression. (Tr. at 405). Dr. Binder did not list mental retardation as a diagnosis. (Tr. at 393, 397). Dr. Binder further noted that Claimant possessed a GED, had previously worked as a janitor and cook, and had taken an IQ test in October 2002, which was deemed invalid. (Tr. at 405). Dr. Binder also observed that Ms. Price had opined that Claimant was malingering. (*Id.*) In addition, Dr. Binder recorded that Claimant was capable of taking care of her personal needs and grooming without assistance. (*Id.*)

That same day, Dr. Binder completed a Mental Residual Functional Capacity Assessment. (Tr. at 408-11). He found that Claimant was not significantly limited in the category of understanding and memory. (Tr. at 408). As to sustained concentration and persistence, he opined that Claimant was not significantly limited in her ability to carry out very short and simple instructions, carry out detailed instructions, sustain ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple work-related decisions. (*Id.*) However, he determined that Claimant was moderately limited in her ability to maintain attention and concentration for extended periods, and her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (*Id.*) He also concluded that Claimant was markedly limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number

and length of rest periods. (Tr. at 409). As to social interaction, Dr. Binder found that Claimant was moderately limited in her ability to interact appropriately with the general public as well as her ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 409). Otherwise, Dr. Binder indicated that Claimant had no limitations in social interaction. (*Id.*) As for Claimant's ability to adapt, Dr. Binder opined that Claimant was moderately limited in her ability to set realistic goals or make plans independently of others. (*Id.*) Dr. Binder ultimately opined that Claimant likely would have marked difficulty completing a workweek based on Claimant's reported activities of daily living and Dr. Thornton's opinion. (Tr. at 410).

Holly Cloonan, Ph.D., completed a Psychiatric Review Technique on July 22, 2011. (Tr. at 420-33). Dr. Cloonan noted that Claimant suffered from affective disorders and anxiety-related disorders, but opined that Claimant's medical impairments were not severe. (Tr. at 420). As to affective disorders, Dr. Cloonan noted Claimant had received a diagnosis of bipolar disorder, not otherwise specified. (Tr. at 423). She also noted that Claimant suffered from anxiety disorder, not otherwise specified. (Tr. at 425). Dr. Cloonan did not address the listing for mental retardation. (Tr. at 424). As to Claimant's functional limitations, Dr. Cloonan found that Claimant was mildly limited in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 430). Dr. Cloonan indicated that Claimant had not experienced any episodes of decompensation of extended duration. (*Id.*) She determined that the evidence did not establish the paragraph "C" criteria. (Tr. at 431). Dr. Cloonan noted that Claimant alleged "manic, bipolar, osteoporosis, and knots on her feet." (Tr. at 432). Dr. Cloonan acknowledged that Claimant reported she had problems with personal care, taking medicine, feeding herself, walking, standing, sitting, seeing,

hearing or speaking, and getting along with people. (*Id.*) She recognized that Claimant stated she completes some chores and has no hobbies. (*Id.*) Dr. Cloonan opined that Claimant appeared mostly credible; however, she indicated that Claimant's allegation of not getting along with other people was not supported by the medical record. (*Id.*) Dr. Cloonan found that the medical records established that Claimant experienced medical improvement with mental health treatment, and she appeared compliant with her medication. (*Id.*) Dr. Cloonan also noted that Claimant declined to participate in counseling, and she had remained in stable condition for over one year with no recent panic attacks. (*Id.*) In concluding that Claimant no longer suffered from a severe mental condition, Dr. Cloonan also highlighted Claimant's recent GAF score of 70, which was assigned to her by a treating physician. (*Id.*)

On December 26, 2011, Jeff Harlow, Ph.D., completed a Continuing Disability Review Worksheet. (Tr. at 568). He noted that Claimant's CPD impairments included severe depression and headaches. (*Id.*) On the current review section of the form, Dr. Harlow recorded that Claimant's current alleged impairment was manic bipolar disorder. (*Id.*) He reviewed Claimant's mental health treatment records from April 2010 through May 2011, which demonstrated that Claimant often reported doing fine or well. (*Id.*) Claimant's treating physician also observed that she was stable throughout that period. (*Id.*) However, Dr. Harlow opined that significant improvement had not occurred when comparing Claimant's CPD with current clinical data and Claimant's functional activities. (*Id.*) Therefore, Dr. Harlow recommended that her benefits should be continued. (*Id.*)

H. Hoback Clark, M.D., completed a Psychiatric Review Technique on January 25, 2012, finding that Claimant's medical impairments were not severe. (Tr. at 572). She

noted that Claimant suffered from bipolar disorder, not otherwise specified, and anxiety disorder, not otherwise specified. (Tr. at 575, 577). As to Claimant's functional limitations, Dr. Clark found that Claimant was mildly limited in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (Tr. at 582). Dr. Clark indicated that Claimant had not experienced any episodes of decompensation of extended duration. (*Id.*) She also found no evidence to establish the paragraph "C" criteria. (Tr. at 583). In her review of the records, Dr. Clark opined that since Claimant's CPD of June 6, 2003, Claimant had experienced significant medical improvement. (Tr. at 584). Dr. Clark cited a mental health treatment record from April 2011, which indicated Claimant was doing quite well and that she denied significant problems with depression, anxiety, or mood lability. (*Id.*) Dr. Clark also summarized a medical record from December 2011, wherein Claimant reported no significant issues with depression, mood lability, irritability, or agitation, but did describe increased stress. (*Id.*) At that visit, Claimant's attention, concentration, impulse control, and cognition were observed to be intact. (*Id.*) In addition, Dr. Clark recognized that Claimant was able to care for her personal needs and perform household chores. (*Id.*) Dr. Clark observed that Claimant denied problems with concentration, remembering, understanding, and completing tasks. (*Id.*) However, Claimant did report some problems getting along with others and that she sometimes needed help with things. (*Id.*) She also reported days where she was unable to get anything done. (*Id.*) Dr. Clark opined that Claimant was partially credible and found that Claimant did not appear to have significant problems getting along with other people. (*Id.*) She indicated that she evaluated Claimant's case under Listings 12.04 and 12.06. (*Id.*) Dr. Clark ultimately opined that Claimant did not meet or equal the listings and that her impairment was

nonsevere. (*Id.*)

Dr. Clark also completed a case analysis the same day. (Tr. at 570-71). She recognized that Claimant had previously alleged severe depression, headaches, and an inability to function in daily activities. (Tr. at 570). In her case analysis, Dr. Clark summarized a portion of Claimant's records from 2002 through 2003 as well as more recent treatment records from April 2011 and December 2011. (*Id.*) She observed that Dr. Cloonan had opined that medical improvement had occurred and that Claimant only had mild functional limitations. (*Id.*) Dr. Clark also acknowledged that Dr. Harlow had opined that significant medical improvement had not occurred, but she disagreed. (Tr. at 571). Dr. Clark noted that Claimant's mood had been stable on medication and that she had not experienced any recent, significant problem with anxiety. (*Id.*) Dr. Clark again concluded that Claimant did not meet or equal the listings and that her impairment was nonsevere. (*Id.*)

## VI.  <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is

adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

### A. Evidence Submitted to the Appeals Council

Addressing Claimant's challenges in reverse order, she asserts that the Appeals Council improperly rejected new and material evidence supporting the validity of Claimant's IQ test scores and her claims of deficits in adaptive functioning with an onset in the developmental period. (ECF No. 16 at 18-19). She insists that the Appeals Council should have reversed the ALJ's decision and remanded her claim based on the new evidence. (*Id.*) In support of her argument, Claimant specifically cites the psychological evaluation performed by Mr. Morrello and Ms. Garrett in February 2013, (Tr. at 828-56), as well as treatment records from Stonewall Jackson Memorial Hospital, (Tr. at 719-67, 773-807), and St. Joseph's Hospital, (Tr. at 768-72), of which the latter two sets of records pre-date the ALJ's decision. (ECF No. 16 at 18-19).

After the ALJ's October 2012 decision and prior to the Appeals Council's December 2013 denial of the request for review, Claimant submitted medical records to the Appeals Council. In its Notice of Action, the Appeals Council informed Claimant that it had reviewed the evidence submitted by Claimant, but concluded that a portion of the evidence concerned a later time, and thus did not affect the ALJ's decision as to whether Claimant was disabled beginning on or before October 16, 2012. (Tr. at 2). Accordingly, the Appeals Council advised Claimant that it was making this evidence a part of her electronic file and that she could reapply for benefits using this evidence. (*Id.*) However, none of the evidence that the Appeals Council rejected is cited by Claimant in her argument for remand. (*Id.*; ECF No. 16 at 18-19).

On the other hand, in its order, the Appeals Council expressly confirmed that it had made the records from the February 2013 psychological evaluation, Stonewall Jackson Memorial Hospital, and St. Joseph's Hospital a part of the administrative record and had considered them in conjunction with the request for review. (Tr. at 1, 5-6). Accordingly, Claimant's assertion that the Appeals Council rejected this particular evidence as being "about a later time" is simply incorrect; therefore, there is no merit to Claimant's challenge on this ground. For some reason, the Commissioner failed to recognize the error in Claimant's brief and, as a result, never addressed the substance of the new and material evidence that was incorporated into the administrative record after the ALJ's decision. (ECF No. 16 at 19).

In any event, the Court may remand the Commissioner's decision for a rehearing under sentence four of 42 U.S.C. § 405(g). A sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law when reaching the decision, or the basis of the

Commissioner's decision is indiscernible. *Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted). If new and material evidence is submitted after the ALJ's decision, the Appeals Council:

> [S]hall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R 416.1470(b). If a claimant "submit[s] evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence [to the claimant] with an explanation as to which it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application."[6] 20 C.F.R. § 416.1476(b)(1). Consequently, before the Appeals Council will incorporate additional evidence into the administrative record, it must agree that the evidence is "'(a) new, (b) material, and (c) relate[] to the period on or before the date of the ALJ's decision.'" *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)). Evidence is considered new "if it is not duplicative or cumulative," and is considered material "if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* at 96.

When the Appeals Council incorporates new and material evidence into the administrative record, and nevertheless denies review of the ALJ's findings and conclusions, the issue before the Court is whether the Commissioner's decision is

---

[6] While the language of the regulation remains unchanged, the Appeals Council appears to be shifting toward a policy of retaining the evidence that it does not incorporate into the record and placing it in a claimant's electronic file. (Tr. at 2).

supported by substantial evidence in light of "the record as a whole including any new evidence that the Appeals Council specifically incorporated into the administrative record." *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins*, 953 F.2d at 96) (internal markings omitted); *see also Snider v. Colvin* No. 6:12-cv-00954, 2013 WL 4880158, at *5 (S.D.W.Va. Sept. 12, 2013) ("[W]here a claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence and made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings."). If the ALJ's decision is flawed for any of the reasons stated, the Court may remand the matter for a rehearing under sentence four.[7] With this standard in mind, the undersigned will consider the additional evidence incorporated into the record by the Appeals Council to the extent that it is relevant to Claimant's remaining challenge to the Commissioner's decision.

### B. Listing 12.05B

In her first stated challenge to the Commissioner's decision, Claimant argues that the ALJ erred at step one of the continuing disability evaluation process when he failed to consider Listing 12.05B. (ECF No. 13 at 5). A claimant should be found disabled at step one of the continuing disability process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 416.925. The Listing is

---

[7] Sentence four allows the Court to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *See Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including Listing 12.05 (Mental Retardation). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.[8]

*Id.* § 12.00(A). Thus, to qualify for disability under Listing 12.05B, Claimant must establish that she has an intellectual impairment that satisfies both the *diagnostic description* of mental retardation and the set of *severity criteria* outlined in paragraph B. The diagnostic description of mental retardation, sometimes called the first prong of

---

[8] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). This change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. The structure of the listing, its diagnostic description, and its severity criteria are also unchanged.

the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Id.* § 12.05. The set of severity criteria contained in paragraph B, which constitutes the second prong of Listing 12.05B, is: "A valid verbal, performance, or full scale IQ of 59 or less." *Id.*

In the introduction to Section 12.00, the SSA explains that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." *Id.* § 12.00(D)(6)(b). "However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* § 12.00(D)(6)(a). Furthermore, when "considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities." *Id.* § 12.00(D)(5)(c). Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).

Although the criterion involving IQ score is found at the second prong of Listing 12.05B, the accuracy of the score in relation to the diagnosis of mental retardation is often determined by the claimant's level of adaptive functioning. The description of "mental retardation" set forth in Listing 12.05 is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations," including the American Psychiatric Association. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, at 20022 (April 24, 2002).

According to the American Psychiatric Association, "significantly subaverage general intellectual functioning is defined as an IQ of about 70 or below," with IQ levels of 50-55 to approximately 70 corresponding with "mild mental retardation." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 41-42 (4th ed. text rev. 2000) ("DSM–IV"). In contrast, "borderline intellectual functioning" is associated with IQ levels in the 71 to 84 range. *Id.* at 740. The DSM-IV nonetheless cautions that "there is a measurement error of approximately 5 points in assessing IQ," and thus "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." *Id.* Because the ultimate question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole," *Pogue v. Astrue,* 692 F. Supp. 2d. 1088, 1100 (E.D. Mo. 2010), "the propriety of [the] ALJ's decision to discredit an IQ score hinges on the specific facts presented by the record." *Hutson v. Colvin,* No. 6:12-cv-00678, 2013 WL 5409837, at *5 (S.D.W.Va. Sept. 25, 2013) (citing *Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012)).

In this case, four IQ test scores are in the record. First, Claimant was tested by Ms. Price and Ms. Collins-Ballina in 2002, and she obtained a full scale IQ score of 51. (Tr. at 337). The psychologists ultimately found that Claimant's scores were invalid due to a lack of effort. (*Id.*) Next, Claimant was administered an IQ test by Mr. Sheridan in 2011, and she achieved a full scale IQ score of 51. (Tr. at 559). Mr. Sheridan found that these results were valid. (*Id.*) On her third IQ test, administered by Mr. Legg's psychometrician in 2012, Claimant earned a full scale IQ score of 50. (Tr. at 638). Mr.

Legg and his psychometrician found that these scores were valid, although Mr. Legg noted that it would have been "nearly impossible" for Claimant to obtain a GED with such a low IQ. (*Id.*) Finally, Claimant was tested by Ms. Garrett and Mr. Morrello in 2013, and she obtained a full scale IQ score of 57. (Tr. at 831). The two psychologists did not opine that Claimant's score was invalid; instead, they concluded that her intellectual capabilities were comparable with prior IQ test scores that she had received on the same type of test in the past ten years. (Tr. at 832).

At the administrative hearing, Claimant testified that she obtained a GED after taking the GED test three or four times and receiving one-on-one tutoring for one year prior to the test. (Tr. at 60, 75-76). The ALJ pointed out that Claimant had previously stated on a GED Information Sheet that she had never taken the GED before. (Tr. at 79, 305). That same sheet shows that Claimant passed and appears to state that Claimant took all portions of the test in December 1992. (Tr. at 305). At the hearing, the ALJ asked the vocational expert what the odds of Claimant passing the GED test were by guessing; he answered that the chance of that happening was less than 50 percent. (Tr. at 75). The ALJ also inquired of the vocational expert whether there was a threshold IQ score necessary to pass the GED test. (Tr. at 61). The vocational expert responded that he did not believe there was an IQ score associated with passing the GED test, but that he would be surprised if someone with an IQ score in the 50s could obtain a GED. (Tr. at 61-62). Dr. Blair, one of the medical experts at the hearing, interjected and stated that he had been told by persons associated with GED programs that an IQ of at least 80 was required to pass the GED test. (Tr. at 62). Claimant's attorney attempted to show that Claimant was nonetheless illiterate by asking Dr. Blair whether he had encountered persons who had high school diplomas but could not read. (Tr. at 79). The ALJ

determined that counsel's line of questioning was not relevant because Claimant had a GED. (*Id.*) In later questioning of the vocational expert, counsel implied that Claimant obtaining a GED was a "fluke," and that she was functionally illiterate. (Tr. at 106). Claimant maintains (and speculates) in her brief to this Court that her achieving a GED was a "fluke" and that it was essentially given to her out of sympathy. (ECF No. 13 at 12).

When questioned about Claimant's past IQ scores at the administrative hearing, Dr. Blair testified that he believed all of the past scores were invalid. (Tr. at 68). He asserted that there was no indication that a "standard or helpful validity analysis" had been performed with regard to the tests. (*Id.*) In relation to the test administered by Mr. Legg's psychometrician, Dr. Blair stated that he did not believe a psychometrician was qualified to judge the validity of the results. (Tr. at 81). Dr. Blair also indicated that Mr. Legg failed to perform any kind of validity analysis as prescribed by the leading psychological organizations. (*Id.*) Moreover, Dr. Blair criticized Mr. Legg's opinion that Claimant's IQ score was consistent with a history of special education placement because there are so many different kinds of special education, and without knowing in exactly what kind of special education Claimant had been placed, Mr. Legg's conclusion was "ridiculous." (*Id.*) Dr. Blair also noted that Ms. Price deemed the results from the test that she administered to be invalid. (Tr. at 84-85). Dr. Blair further cautioned against assuming that test scores are valid because they are consistent over time, which actually indicates "routine ability," and not validity. (Tr. at 83-84). Ultimately, Dr. Blair opined that nothing in the record suggested any work-related mental limitations. (Tr. at 71). He concluded that Claimant could handle at least detailed, but not complex instructions and tasks. (*Id.*) He also testified that Claimant would not have any problems dealing with the public, coworkers, or supervisors, but she could not perform

fast-paced work with strict production quotas. (Tr. at 72).

In the ALJ's written decision, at step one of the continuing disability process, he found that the severity of Claimant's mental impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06. (Tr. at 42-43). The ALJ did not specifically assess whether Claimant met Listing 12.05. (*Id.*) Later in his decision, the ALJ found that Claimant was never diagnosed with a medically determinable impairment related to her intellectual functioning. (Tr. at 45). He also concluded that the record did not prove that Claimant suffered from any severe intellectual functioning deficits. (*Id.*) In support of his conclusion, the ALJ noted that Claimant's 2002 IQ test score was found to be invalid by the psychologists who administered the test and that there were inconsistencies regarding Claimant's academic history. (*Id.*) The ALJ asserted that Claimant failed to report taking special education classes in her May 1999 and September 2002 Adult Disability forms. (*Id.*) The ALJ relied heavily on Dr. Blair's opinion that a person with an IQ in the 50s could not obtain a GED, and for that reason, the ALJ determined that the result of the IQ test administered by Mr. Sheridan must be invalid. (*Id.*) In concluding his discussion of the issue, the ALJ wrote: "[T]he undersigned finds that the claimant does not have any intellectual limitations, as she is an individual who has obtained her GED." (*Id.*) Although the ALJ discussed some of Mr. Legg's findings and opinions later in his written decision, he did not discuss the IQ test administered by Mr. Legg and his psychometrician. (Tr. at 48-49). Furthermore, while the ALJ described Claimant's activities of daily living in assessing Listings 12.04 and 12.06, and in determining Claimant's credibility, nowhere in his decision did he perform an analysis of early-onset deficits in adaptive functioning. (Tr. at 42-43, 49). Rather, the ALJ concluded that Claimant's current level of functioning permitted her to adequately

perform routine daily tasks. (Tr. at 49).

A number of problems are apparent from the ALJ's discussion, and lack of discussion, of Claimant's IQ scores. First, the ALJ never mentioned the score that Claimant obtained when tested by Mr. Legg's psychometrician, which Mr. Legg concluded was internally valid based on the psychometrician's observations and externally valid based on Claimant's history of special education classes and past test scores. (Tr. at 638-39). While an ALJ is not required to transcribe all of the record evidence into his written decision, he must discuss the evidence supporting his decision *as well as* "the uncontroverted evidence he chooses not to rely upon," and "significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler*, 739 F.2d. 1393 (9th Cir. 1984)). Here, the IQ score obtained during Mr. Legg's evaluation of Claimant merited at least some discussion, yet it received not even passing mention. *See Washington v. Colvin*, No. 5:13-cv-503-BO, 2014 WL 4105679, at *2 (E.D.N.C. Aug. 19, 2014) (reversing Commissioner's decision and remanding where ALJ failed to discuss IQ score in record when analyzing Listing 12.05C); *McKinney v. Astrue*, No. 1:11-cv-01462, 2013 WL 1137485, at *5 (S.D. Ind. Mar. 18, 2013) (reversing Commissioner's decision and remanding where ALJ failed to mention IQ score that potentially supported claimant's allegations); *Roberts v. Astrue*, No. CV 111-154, 2012 WL 4897443, at *6-*7 (S.D. Ga. Sept. 20, 2012) (recommending reversal of Commissioner's decision and remand based on ALJ's failure to consider Listing 12.05C and claimant's IQ test results), report and recommendation adopted by 2012 WL 4894492 (S.D. Ga. Oct. 15, 2012).

Furthermore, while the Commissioner argues that this score was invalid because the test was administered by Mr. Legg's psychometrician, she has offered no support for

this position other than Dr. Blair's testimony at the administrative hearing that a psychometrician is not qualified to gauge the validity of an IQ test.[9] (ECF No. 16 at 17). Various cases demonstrate some disagreement over this proposition. *Compare Sellers v. Barnhart*, 246 F.Supp.2d 1201, 1207-08 (M.D. Ala. 2002) (affirming ALJ's decision that IQ score was not valid because psychometrician administered test and psychometrician did not provide opinion as to validity of results), *with Radford v. Colvin*, No. CIV-13-976-R, 2014 WL 6826274, at *2-*4 (W.D. Okla. Dec. 3, 2014) (reversing Commissioner's decision and remanding to consider IQ score obtained after test administered by psychometrist), *and Matthews ex rel. Dixon v. Barnhart*, 339 F.Supp.2d 1286, 1290 n.3 (N.D. Ala. 2004) (recognizing that psychometrist was qualified to test and determine IQ); *see also Law v. Colvin*, No. 1:13-01253, 2014 WL 4656120, at *7, *13-*15 (S.D.W.Va. Sept. 16, 2014) (citing psychological test results obtained by psychometrist without questioning whether psychometrist was qualified to administer tests).[10] Indeed, the very definition of a psychometrician's job responsibilities includes administering and scoring psychological and neuropsychological tests under the supervision of a licensed psychologist or neuropsychologist. *Richardson v. Branker*, 668 F.3d 128, 151 n.24 (4th Cir. 2012).

---

[9] On the subject of psychological testing, Appendix 1 to Subpart P of the Administrative Regulations, Section 12.00(D)(5) states that an individual is qualified within the meaning of the regulation to administer a standardized psychological test where "the specialist [is] currently licensed or certified in the State to administer, score, and interpret psychological tests and ha[s] the training and experience to perform the test."

[10] A psychometrician is defined as (1) an individual "(as a clinical psychologist) who is skilled in the administration and interpretation of objective psychological tests; (2) a psychologist who devises, constructs, and standardizes psychometric tests." © Merriam-Webster Medical Dictionary. A psychometrist is a trained individual "responsible for the administration and scoring [of] psychological and neuropsychological tests under the supervision of a clinical psychologist or clinical neuropsychologist." © 2015 The National Association of Psychometrists.

Here, the test was administered by Mr. Legg's psychometrician, Ms. Woolwine, who had a Bachelor of Sciences degree and worked under Mr. Legg's supervision. Moreover, Mr. Legg interpreted the test scores in his report and provided *his* opinion as to the validity of the results based on Ms. Woolwine's documented observations. (Tr. at 638-39). Accordingly, the "validity opinion" was confirmed and adopted by a Licensed Psychologist. On a side note, the undersigned finds it only fair to emphasize that Mr. Legg and Ms. Woolwine were selected by the Disability Determination Service to perform the psychological evaluation on Claimant for the purpose of assessing her mental functional status, including her level of intelligence. Frankly, it strikes the Court as disingenuous for the Commissioner to disparage the credentials of the very consultants to whom the agency referred the Claimant. The Commissioner also challenges Mr. Legg's findings based on his opinion that Claimant had only mild limitations in her ability to understand, remember, and carry out complex instructions, and that she had no limitations in understanding, remembering, and carrying out simple instructions. (ECF No. 16 at 18). However, the Commissioner's argument misses the mark. The pertinent issue is whether the ALJ sufficiently analyzed Listing 12.05 given the evidence before him, not whether his RFC determination was accurate or whether the ALJ's analysis of the criteria for Listings 12.04 and 12.06 was sufficient.

More importantly, the Commissioner's current arguments for rejecting Mr. Legg's IQ findings are not found in the ALJ's decision. The ALJ simply never addressed the IQ results from Mr. Legg's evaluation, and thus, he had no opportunity to analyze their validity. The Commissioner's *post hoc* rationale cannot suffice to excuse the ALJ's failure. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing

grounds in support of the agency's decision that were not given by the ALJ."); *Buckheister v. Astrue*, No. 4:10-2450-TER, 2012 WL 786355, at *8 (D.S.C. Mar. 9, 2012) (rejecting Commissioner's argument on grounds that it constituted *post hoc* rationale for ALJ's decision).

In addition, the undersigned agrees with Claimant that the ALJ placed too much emphasis on Claimant's GED. The ALJ relied almost exclusively on the Claimant's ability to obtain a GED as the basis for his determination that Claimant did not suffer from any intellectual limitations. (Tr. at 45). The only evidence cited by the ALJ in support of his conclusion that Claimant could not have both intellectual limitations and a GED was Dr. Blair's testimony at the administrative hearing that a person must have an IQ of at least 80 to pass the GED test. (*Id.*) However, Dr. Blair's testimony on the matter rests on an uncertain and unreliable foundation. According to Dr. Blair, he formed this opinion based on information he was given from unidentified persons associated with "GED programs." (Tr. at 62). It is unclear who these people are, what qualifications they have, and whether any objective study was performed in arriving at that conclusion, or whether the statement was pure speculation. Moreover, the ALJ's decision refuses to acknowledge that statistical outliers exist. It is statistically more likely than not that there are individuals with IQ scores in the 50-60 range who have obtained GED's. Nevertheless, the ALJ refused to even consider this potential, both at the administrative hearing and in his written decision. Indeed, a number of courts have recognized that earning a GED is *not incompatible* with low IQ scores. *See Markle v. Barnhart*, 324 F.3d 182, 183, 186-87 (3d Cir. 2003) (finding that IQ of 70 was not incompatible with claimant earning GED and his ability to read, write, add, subtract, perform simple manual labor, live alone, go shopping, and manage his finances); *Vieira*

*v. Colvin*, No. 2:11-cv-02342, 2013 WL 1195287, at *12 (E.D. Cal. Mar. 22, 2013) ("The fact that plaintiff ultimately received his GED does not eviscerate a long record of academic difficulty or IQ scores between 60 and 70."); *Rivers v. Astrue*, No. 8:10-cv-314, 2011 WL 2581445, at *14 (D.S.C. May 25, 2011) (rejecting ALJ's heavy reliance on claimant earning GED to discredit claimant's consistently low IQ scores where there was no evidence of malingering during IQ test that claimant relied on to support allegations); *Blackwell v. Comm'r of Soc. Sec.*, No. 08-374, 2008 WL 4853824, at *4 (W.D. Pa. Nov. 6, 2008) (finding that claimant's ability to read, write, and speak coherently along with his attaining GED with help from tutor was "not inconsistent with IQ scores showing mild mental retardation"). As such, the ALJ's cursory analysis of Claimant's IQ scores is inadequate, and his rejection of Claimant's IQ scores primarily on the basis of her GED is inappropriate. The ALJ similarly erred by rejecting the opinions of Dr. Sheridan regarding the validity of Claimant's IQ scores based on Dr. Blair's bald statement concerning the intellectual prerequisites for passing the GED test. Mr. Sheridan examined Claimant; Dr. Blair did not. Without a more substantial explanation, the ALJ should not have rejected Mr. Sheridan's opinion that Claimant's IQ scores were valid in favor of Dr. Blair's opinion. *See* 20 C.F.R. § 416.927(c)(1) (recognizing that, in general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source.)

The ALJ's finding as to Claimant's IQ is also undermined by the IQ test results from the psychological evaluation of Claimant by Mr. Morrello and Ms. Garrett in February 2013, which were made a part of the record by the Appeals Council. (Tr. at 6). Claimant's full scale IQ as measured at that evaluation was 57. (Tr. at 831). Neither psychologist found that Claimant's score was invalid. (Tr. at 832). In relation to the

47

test's confidence interval, Mr. Morrello and Ms. Garrett opined that Claimant's true score would fall within the mild mental retardation range 95 times out of 100. (*Id.*) This evidence certainly demonstrates that Claimant's IQ is consistently within the 50-60 range when tested. While consistency and validity are separate considerations, consistency is an important factor to consider in examining IQ test scores.

Another area of concern is the factual inaccuracies found within the ALJ's discussion of Claimant's intellectual functioning. First, the ALJ seemed to opine, and certainly implied, that Claimant was never specifically diagnosed with a medically determinable impairment related to her intellectual functioning. (Tr. at 45). That implication is incorrect. Mr. Sheridan diagnosed Claimant with mild mental retardation in December 2011, (Tr. at 561), and Mr. Legg diagnosed Claimant with mild mental retardation based on her history and test scores in June 2012, (Tr. at 640).[11] The regulations define a medically determinable impairment as one that "result[s] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.927(a)(1). Given Mr. Sheridan's and Mr. Legg's diagnoses of Claimant based on their findings after evaluating Claimant, the assertion by the ALJ that Claimant did not have a medically determinable impairment related to intellectual functioning was erroneous.

Additionally, the ALJ found that Claimant had completed Adult Disability forms on May 5, 1999, and September 5, 2002, wherein she purportedly stated that she had

---

[11] The DSM-IV states that persons diagnosed with mild mental retardation may "achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings." DSM-IV at 43.

never been enrolled in special education classes. (Tr. at 45). However, there is no Adult Disability form from May 5, 1999 in the record, and in her Disability Report from September 5, 2002, Claimant unequivocally states that she attended special education classes in reading and English. (Tr. at 238). While Claimant later informed Mr. Sheridan that she also received special education in the subject of math, (Tr. at 556), there is nothing in the record to suggest that Claimant ever denied receiving special education. Furthermore, if the ALJ had doubts about Claimant's history of special education, then he could have developed the record at the administrative hearing or requested additional documentation on the issue, which he did not. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (recognizing that ALJ has a duty to fully and fairly develop the record). This is particularly true where, as here, the ALJ severely limited Claimant's counsel's ability to ask questions of her at the hearing.[12] (Tr. at 102-03).

---

[12] The ALJ interrupted counsel as she was examining Dr. Blair on the subject of Claimant's IQ scores and asked Claimant whether she had obtained her GED. (Tr. at 74-75). When counsel attempted to broach the subject of whether a functionally illiterate person could obtain a high school diploma, the ALJ again interrupted counsel and stated that Claimant had a GED, which was all he needed to know. (Tr. at 78-79). Later in the hearing, when counsel attempted to explain that she had been "diligently searching" for Claimant's school records, the ALJ interjected that he was going to narrow the issue *solely* to the validity Claimant's IQ score. (Tr. at 85). When counsel then attempted to further question Dr. Blair as to Claimant's IQ scores, the ALJ interrupted and informed counsel that they were "done dealing with the IQ issue." (Tr. at 86). While counsel was permitted to briefly question Claimant in relation to her GED, (Tr. at 76), when counsel attempted to ask further questions of her, the ALJ stated: "I already questioned your claimant, and I said her complaints and daily activities are already in the file, so it's already covered." (Tr. at 102). Consequently, the ALJ did not permit counsel to ask any further questions of Claimant, and counsel objected to the ALJ's ruling in this respect. (Tr. at 102-03). An ALJ may "set reasonable limits on testimony," including the subject and scope of a claimant's testimony, but the ALJ should not substantially interfere with a claimant's right to testify. *See York v. Colvin*, No. 1:13-cv-00311-JDL, 2014 WL 4181616, (D. Me. Aug. 21, 2014) (recognizing that ALJ may "set reasonable limits on testimony") (citing Hearings, Appeals, and Litigation Law Manual (HALLEX) § I-2-6-60(A)); *Machia v. Astrue*, 670 F. Supp. 2d 326, 337 n.14 (D. Vt. 2009) (recognizing claimant's right to testify at administrative hearing); 20 C.F.R. § 416.1450(a) (recognizing claimant has right to present evidence and state his or her position at administrative hearing); Social Security Ruling (SSR) 79-19, 1979 WL 15541, at *2 (noting that claimant has right to testify and present evidence at administrative hearing); SSR 13-1p, 2013 WL 633939, at *3 (recognizing that it is an abuse of discretion for ALJ to refuse to allow claimant to testify); HALLEX I-2-6-60(A)-(B) (stating that ALJ determines subject and scope of claimant and witness testimony and that ALJ may limit questioning where it is repetitive, cumulative, or designed to intimidate, harass, or embarrass the witness).

The ALJ also failed to discuss certain probative evidence in his analysis. For example, the ALJ did not discuss Claimant's scores on the WRAT-IV and Woodcock-Johnson III Normative Update Tests of Achievement, which were administered by Mr. Legg and Mr. Sheridan, respectively. (Tr. at 560, 639). Both tests demonstrated that Claimant's reading ability was consistent with that of a first-grade student. (*Id.*) The ALJ also failed to consider the confidence intervals for the IQ tests administered by Mr. Sheridan and Mr. Legg's psychometrician. (Tr. at 559, 638).

Finally, the ALJ failed to conduct the type of adaptive functioning analysis required by Listing 12.05. As previously stated, intrinsic to the diagnostic description of mental retardation is evidence of early-onset (pre-age 22) deficits in adaptive functioning. Adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." DSM–IV at 42.[13] Skill areas of adaptive functioning include "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 41. To determine whether a claimant demonstrates deficits in adaptive functioning that manifested during the developmental period, the ALJ must perform a fact-specific inquiry. Although this inquiry has "few bright line rules," courts in this circuit have pointed to multiple factors that tend to establish the presence of deficits in adaptive

---

[13] The SSA recognizes four major professional organizations that each has its own definition of mental retardation. All four definitions include significant deficits in adaptive functioning as an element of the condition although the organizations differ in the required date of onset and the method of measurement. *See* Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association's definition, while not specifically adopted by the SSA, is generally accepted and recognized in the field of mental health.

functioning with an early onset. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases). For example, if a claimant has previously been diagnosed with mental retardation, courts are inclined to find that the claimant had an earlier onset of deficits in adaptive functioning. *Conyers v. Astrue,* No. 4:11–CV–00037–D, 2012 WL 3282329, at *8-9 (E.D.N.C. June 29, 2012). In addition, evidence of a claimant's illiteracy, *Rivers*, 2011 WL 2581447, at *4, evidence that a claimant has never lived independently, *Holtsclaw v. Astrue,* No. 1:10CV199, 2011 WL 6935499, at *5 (W.D.N.C. Dec. 30, 2011), and evidence that a claimant is dependent on others, or has never been responsible to care for others, *Salmons v. Astrue,* No. 5:10-CV-195–RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012), have all been considered proof of deficits in adaptive functioning that manifested before age 22.

Another well-recognized indicator of limitations in adaptive functioning manifesting in the developmental years is poor academic performance. *Smith v. Astrue,* 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011); *Salmons*, 2012 WL 1884485, at *7 ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22."). Accordingly, school records showing ongoing problems in the classroom are important evidence of early-onset deficiencies in functioning that should not be undervalued when assessing the first prong of Listing 12.05B. Work history is also a factor to consider, as absent or unstable job performance may indicate deficits in adaptive functioning; although, the existence of a stable work history, by itself, is not determinative of the inquiry. *See Salmons,* 2012 WL 1884485, at *2-3 (citing *Luckey v. U.S. Dep't of Health & Human Servs.,* 890 F.2d 666, 669 (4th Cir. 1989)).

In this case, the ALJ did not address Claimant's level of adaptive functioning as

contemplated by Listing 12.05B. The ALJ failed to explore or discuss Claimant's academic performance. Claimant reported on a number of occasions that she took special education classes and that she dropped out of school after completing the eighth grade. (Tr. at 238, 336, 555-56). Yet, the ALJ only gave Claimant's special education participation passing mention, and as noted above, the ALJ incorrectly determined that Claimant had previously reported that she was never enrolled in special education. (Tr. at 45). To the extent that the ALJ found a conflict in the evidence concerning Claimant's special education, he failed to reconcile the conflict and assign weight to the evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (recognizing that ALJ should "explicitly indicate[ ] the weight given to all of the relevant evidence."). As described above, Claimant's achievement test scores tended to indicate that she had a very low-level reading ability. (Tr. at 560, 639). In addition, the ALJ did not discuss the fact that Claimant dropped out of school before completing the ninth grade.[14]

Moreover, the ALJ described Claimant's work history and noted it was "poor," which also tends to indicate a deficit in adaptive functioning. (Tr. at 46, 49). According to Claimant, her work was relatively unskilled, e.g. stocking shelves at a school cafeteria, and she only worked for a few days each month to retain her welfare check. (Tr. at 46). There was also some evidence that Claimant relied on others to help with performing household chores, filling out paperwork, shopping, running errands, remembering appointments, managing her finances, and ensuring that she takes her medications. (Tr. at 242, 244-45, 251-52, 254, 338, 557). Claimant also presented a

---

[14] Additional evidence incorporated into the record from Stonewall Jackson Memorial Hospital provides that Claimant missed "a lot of school due to black out spells" in 1976, and that Claimant was provided a "homebound teacher" during that time. (Tr. at 737, 745).

letter at the administrative hearing from a friend who stated that he checked on Claimant every day and ensured that Claimant took her medications and had a meal to eat. (Tr. at 57-58, 307). In addressing Claimant's ability to perform routine daily tasks, the ALJ recognized that conflicting evidence existed, and he ultimately found that Claimant could adequately perform daily tasks, including taking care of her personal hygiene, taking her medication, preparing herself meals, performing household chores, and leaving her home to run errands. (Tr. at 49). He dismissed Claimant's friend's letter because he was not an acceptable medical source and his statements were not supported by the record evidence. (Tr. at 51).

Nevertheless, the ALJ failed to analyze Listing 12.05B and failed to perform the requisite adaptive functioning analysis contemplated by that listing.[15] *See Jackson v. Astrue*, No. 8:08-2855, 2010 WL 500449, at *6 (D.S.C. Feb. 5, 2010) (reversing Commissioner's decision and remanding where ALJ failed to discuss elements of Listing 12.05). Furthermore, as concluded above, the ALJ's consideration of Claimant's IQ scores was inadequate. "It does not seem too exacting for the Court to expect a more disciplined explanation before such scores can be so flatly disregarded." *Id.* at *8. Because the undersigned **FINDS** that the ALJ did not conduct a proper review at the

---

[15] The Commissioner cites a number of cases on the issue of adaptive functioning prior to age 22. (ECF No. 16 at 15). Setting aside the fact that the ALJ never addressed the issue and that the adaptive functioning inquiry is incredibly case specific, the cited cases are nonetheless distinguishable. In *Eddy v. Comm'r of Soc. Sec.*, 506 F. App'x 508, 510 (6th Cir. 2012), the Sixth Circuit concluded that attending special education classes and dropping out of school after the eighth grade was insufficient to establish deficits in adaptive functioning prior to age 22. However, in that case, the Sixth Circuit specifically highlighted the fact that the claimant was never diagnosed with mental retardation, and there was no discussion by the court of any IQ test scores. *Id.* at 510. The Commissioner also relies on *Foster v. Halter*, 279 F.3d 348 (6th Cir. 2001). In that case, the court held that a claimant had not established the onset of deficits in adaptive functioning before age 22 where she had a full scale IQ of 68 or 69, she received special education services, and dropped out of school after ninth grade. *Id.* at 352, 354-55. However, *Foster* is distinguishable from this case because the claimant in that case had a work history reflecting that she could perform "relatively complex tasks." *Id.* at 355. Furthermore, there are cases from other federal courts of appeals where deficits in adaptive functioning prior to age 22 have been found to exist based on enrollment in special education and low-grade dropout. *See Gomez v. Astrue*, 695 F. Supp. 2d 1049, 1061 (C.D. Cal. 2010) (collecting cases on adaptive functioning).

first step of the continuing disability determination process, the case should be remanded for further proceedings. *Beckman v. Apfel*, No. WMN-99-3696, 2000 WL 1916316, at *9 (D. Md. Dec. 15, 2000) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing.") (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir.1986)).

### C. Listing 12.05C

While Claimant does not raise the issue, the undersigned finds its appropriate to also briefly address Listing 12.05C given the evidence presented in this case. Put simply, to qualify for disability under Listing 12.05C, Claimant must establish that he has an intellectual impairment that satisfies both the *diagnostic description* of mental retardation and the *severity criteria* set forth in paragraph C. The diagnostic description of mental retardation, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" **and** "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05C.

In this case, even considering a nearly twenty-point margin of error for Claimant's IQ test scores, she would still meet the full scale IQ requirement for Listing 12.05C. Additionally, the ALJ found that Claimant's osteoporosis, bipolar disorder, and anxiety disorder had been severe impairments since October 28, 2011. (Tr. at 44).

Accordingly, if Claimant's IQ scores were valid, Claimant would at least meet the severity criteria of Listing 12.05C. *See Reynolds v. Colvin*, No. 6:13-cv-22604, 2014 WL 4852242 (S.D.W.Va. Aug. 19, 2014) (recognizing that finding of severe impairment establishes the third prong of Listing 12.05C), report and recommendation adopted by 2014 WL 4852250 (S.D.W.Va. Sept. 29, 2014). As such, the ALJ should have, at a minimum, performed an adaptive functioning analysis under Listing 12.05C. However, he failed to do so. The undersigned **FINDS** that the ALJ's deficiency in this respect provides an additional basis for remand. *See Jackson*, 2010 WL 500449, at *6; *Beckman*, 2000 WL 1916316, at *9.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 13); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 16); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to determine if Claimant's impairments meet or equal Listings 12.05B and 12.05C; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  February 17, 2015

Cheryl A. Eifert
United States Magistrate Judge